IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WILLIAM FERANDES,

    Plaintiff,

v.                                                                          Civil Action No.: BAH-24-2011

WARDEN WEBER ET AL.,

    Defendants.

## MEMORANDUM OPINION

William Ferandes, a self-represented plaintiff incarcerated at Western Correctional
Institution ("WCI"), filed this civil rights complaint pursuant to 42 U.S.C. § 1983 alleging
inadequate medical care. ECF 1. Ferandes, with permission, later filed an amended complaint
naming as defendants Warden Weber; Assistant Warden Butler; Maryland Division of Correction;
Janette Clark, NP ("NP Clark"); Tammy Buser, RN ("RN Buser"); Cynthia O. Taferi, RN ("RN
Taferi"); Radiologist Labib H. Syed, MD ("Dr. Syed"); RN Evans Budu ("RN Budu"); Sandra
Shank, RN ("RN Shank"); Kimberly Fazenbaker, RN ("RN Fazenbaker"); Queen Ehigiator, RN
("RN Ehigiator"); Elizabeth Talley, RN ("RN Talley"); YesCare Corp. ("YesCare"); and Centurion
of Maryland, LLC ("Centurion").[1] ECF 16.

In response, RN Shank filed a motion to dismiss, ECF 33, which Ferandes opposed, ECF
39, and to which RN Shank replied, ECF 43. Defendants YesCare, NP Clark, RN Fazenbaker, and
RN Talley filed a motion to dismiss or, alternatively, for summary judgment. ECF 35 (hereinafter

---

[1] The Clerk will be directed to amend the docket to reflect the full and correct spelling of
Defendants' names as reflected in their motions, *see* ECFs 33, 35, 37, 48, 50, as well as the sealed
notice at ECF 23 identifying "R.N. Khudu" as Evans Budu, RN. The Court will refer to the
corrected spellings of Defendants' names throughout this opinion.

"YesCare's motion"). Separately, Defendants Centurion, RN Buser, NP Clark, and RN Fazenbaker moved to dismiss or, alternatively, for summary judgment.[2]   ECF 37 (hereinafter "Centurion's motion"). Ferandes opposed Centurion's motion, ECF 44, and the Centurion Defendants replied, ECF 45. Defendants Warden Weber, Assistant Warden Butler, and the Maryland Division of Correction (collectively the "State Defendants") filed a motion to dismiss, ECF 48, which Ferandes opposed, ECF 52, and to which the State Defendants replied, ECF 54.[3]   Finally, Defendant RN Ehigiator filed a motion to dismiss or, alternatively, for summary judgment. ECF 50 (hereinafter "RN Ehigiator's motion"). Ferandes filed an opposition, ECF 51, and RN Ehigiator replied, ECF 53. Defendants RN Taferi, RN Budu, and Dr. Syed have not yet appeared in this action as they have not been served.[4]

No hearing is required to address the pending motions. *See* Local Rule 105.6 (D. Md. 2025). For the reasons that follow, and by separate order which follows, YesCare's motion will be denied. All other Defendants' motions will be granted.

## I.   **BACKGROUND**

### A.   **Amended Complaint Allegations**

Ferandes claims that he was denied adequate medical care in violation of his Eighth Amendment rights. ECF 16. He alleges that on June 10, 2022, he was evaluated by NP Clark for

---

[2] Centurion took over for YesCare as healthcare provider at WCI on August 1, 2024. *See* ECF 37, at 1 n.2. Centurion's motion incorporates the arguments made in YesCare's motion. *Id.*

[3] The State Defendants filed a motion for extension of time *nunc pro tunc* contemporaneously with their motion to dismiss, or in the alternative, for summary judgment. ECF 47. The motion for extension of time will be granted.

[4] RN Budu and RN Taferi have not yet been served as they were subcontractors for YesCare, and thus YesCare's attorneys were unable to accept service on their behalf. *See* ECFs 21 and 23. YesCare "searched its employee database and [could not] locate . . . any radiologist named Syed." ECF 21, at 1.

2

an injury to his finger, and Clark taped his index and middle fingers together, but stated that she did not want to provide further treatment "due to [the] fact [that] she had stitched [his] eye." *Id.* at 1–2. Ferandes claims that he did not receive any further treatment or pain medication for his disfigured finger on that day. *Id.* at 2. He underwent an x-ray four days later which showed "ulnar and dorsal displacement of the proximal phalanx on the metacarpal," but he did not receive any further care for the injury until January 12, 2023. *Id.* Ferandes further alleges that NP Clark's "denial of care was malicious," based on her statement that she was "tired after stitching [his] eye." *Id.* Ferandes contends that NP Clark had a duty to ensure that he receive adequate care, including that he be scheduled for follow-up appointments, but she failed to do so. *Id.*

Ferandes alleges that Dr. Syed "failed to forward x-ray to med. Dept. to be read and shared with [him]." *Id.* at 3. Ferandes speculates that the first x-ray was lost, because on December 21, 2022, he was required to undergo a second x-ray. *Id.* at 3–4. He also blames NP Clark for failing to review the x-ray with him until he made sick call requests. *Id.* at 3.

Ferandes alleges that on January 12, 2023, NP Clark examined his finger again. *Id.* at 4. He claims he filed numerous sick call requests over the previous eight months and repeatedly saw nurses who promised him treatment at a later date. *Id.* He saw RN Taferi, who was unaware that he needed surgery and told him to exercise his finger. *Id.* Further, he alleges that NP Clark never called him back to remove stiches in his eye, which "grew out painfully" for three months. *Id.* He alleges that he submitted repeated sick call requests regarding both his finger and stitches and claims that none were addressed. *Id.* at 5.

Fernades alleges a "custom or policy of denying care or giving inadequate care," citing his repeated sick calls and nurse visits over the course of seven to eight months regarding his finger injury before he saw a provider. *Id.* at 4. He alleges that the "medical department" violated their

"contractual policy" of seeing him within three days after his sick call requests. *Id.* at 5. By way of an example, Ferandes alleges that he filed a request on December 21, 2022, RN Budu received the request on December 22, 2022, he saw RN Buser on January 4, 2023, and he finally saw NP Clark on January 12, 2023. *Id.* Ferandes further alleges that he filed a sick call request on February 1, 2023, and RN Ehigiator received the request on February 6, 2024, but when he saw RN Talley, Ehigiator did not examine him but instead referred him to a provider. *Id.* at 6. He alleges that Ehigiator denied him care by neglecting her duty to triage and forward his requests in a timely manner in February and April 2023. *Id.*

Ferandes states that in February of 2023, he went to Precision Orthopedics where he was told he needed surgery on his finger. *Id.* at 6. He underwent surgery approximately six months later on August 14, 2023. *Id.* Following the surgery, Ferandes filed multiple sick call requests and was seen by nurses who, he alleges, did not examine him or even take vitals, such as RN Fazenbaker in October of 2023 and RN Talley in February of 2024. *Id.* at 7. Ferandes notes that many other inmates have filed grievances regarding similar issues. *Id.* He states that his finger is still deformed, stiff, and painful. *Id.* at 8.

## B.    Medical Records

Ferandes' medical records were submitted in support of YesCare's motion and are summarized below. *See* ECF 35-3 through 35-7.

On June 10, 2023, Ferandes saw NP Clark for an urgent provider visit following an altercation. ECF 35-5, at 2–4. He was given a decontamination shower due to pepper spray exposure. *Id.* at 2. Upon examination, NP Clark noted left finger pain and a cut above the left eye. *Id.* Clark taped the injured pointer finger to the middle finger, ordered an x-ray, and closed the cut

above the eye with four stitches. *Id.* NP Clark's plan for care was to follow-up with a provider after the x-ray and for nursing to remove sutures in 7–10 days. *Id.* at 3.

On June 14, 2022, Ferandes underwent an x-ray of his right second digit, and a report signed by radiologist Dr. Syed showed an ulnar and dorsal displacement of the proximal phalanx on the metacarpal but explicitly noted "no evidence of an acute fracture."[5] ECF 35-7, at 17.

On June 29, 2022, Ferandes saw RN Taferi for an unscheduled sick call complaining of a swollen finger. ECF 35-4, at 35; ECF 35-5, at 1. Ferandes reported that he hurt his finger in his cell slot, has been in pain since, and is waiting on results of an x-ray. ECF 35-5, at 1. Taferi gave Ferandes ibuprofen and advised him to continue exercising the finger to avoid stiffness. *Id.* She stated that she would refer him to a provider. *Id.*

Ferandes submitted a sick call request dated December 21, 2022, complaining that his hand has been dislocated since June, that he is in serious pain, that he has submitted multiple sick calls, and that had already had an x-ray. ECF 35-5, at 30. The slip was triaged on December 22, 2022, and signed by a provider on January 4, 2023. *Id.*

On January 4, 2023, Ferandes saw RN Buser for a scheduled sick call complaining that his finger was "out of joint." ECF 35-4, at 33. Buser noted that Ferandes was seen in June for a possible broken finger and that the x-ray showed dislocation, not a break. *Id.* at 34. She observed that the finger was dislocated and had very limited function, and she indicated that she would "attempt to get him scheduled asap with a provider." *Id.* Buser noted that she spoke with a provider and scheduler so he could be scheduled "tomorrow." *Id.* at 33. On January 12, 2023, Ferandes saw Christopher Brandon, PA, for an unscheduled provider visit regarding his finger pain. *Id.* at

---

[5] The report states the x-ray was of Ferandes' right finger, however all other records indicate that the injury was to his left hand. *See* ECF 35-7, at 17.

30. Ferandes told Brandon that he had injured his finger in June of 2022 and had an x-ray, but that he "never heard anything more." *Id.* Ferandes complained that he still had swelling, pain, and decreased range of motion, and he denied any new injury to the finger. *Id.* Upon examination, deformity and decreased range of motion were noted. *Id.* at 31. PA Brandon noted that a June 10, 2022 x-ray showed ulnar and dorsal dislocation of the phalanx on metacarpal and no acute fracture. *Id.* He ordered a new x-ray and an orthopedic/hand consultation. *Id.*

On January 13, 2023, Ferandes' left finger was x-rayed again, revealing a dorsal ulnar dislocation involving the second metacarpal phalangeal joint. ECF 37-7, at 18. Scott Logan, MD of Global Diagnostic Services, who signed the report but was not provided comparison exams, recommended that "[i]f the patient has persistent pain, a follow-up radiographic in 10-13 days, MRI or three phase bone scan would be recommended to exclude an occult fracture." *Id.* at 18–19. A follow-up x-ray was conducted on January 24, 2023, with the same result. *Id.* at 20–21.

On January 25, 2023, Ferandes was approved for an orthopedic/hand surgery evaluation. ECF 35-5, at 31. On February 16, 2023, Ferandes saw Rishi Bhatnagar, MD, at Precision Orthopedics and Sports Medicine. ECF 35-7, at 22–23. Dr. Bhatnagar noted that conservative treatments including rest and activity modification had failed and observed that Ferandes continues to experience limitations in activities of daily living as well as pain. *Id.* at 23. Therefore, Dr. Bhatnagar recommended surgery, and Ferandes agreed. *Id.*

On February 28, 2023, Ferandes saw Masoud Djahanmir, MD, for a follow-up after a visit to the orthopedic surgeon. ECF 35-4, at 27–29. Dr. Djahanmir noted that an x-ray "revealed chronic left index finger MCP dislocation," observed that Ferandes was unable to flex the finger, and repeated that he had seen an orthopedic surgeon on February 16, 2023, who had recommended surgery. *Id.* at 27. Dr. Djahanmir indicated that he would generate a consult for surgery. *Id.* at 28.

6

Ferandes submitted a sick call slip complaining of pain and throbbing in his hand and finger. ECF 35-5, at 26. The slip was dated by Ferandes as being submitted on April 9, 2023, but was marked as triaged by "Queen" (RN Ehigiator) on February 6, 2024 (and signed by Fernandes attesting to this date), and later signed by a provider on February 8, 2024.[6] *Id.* Ferandes submitted another sick call slip regarding his hand which was marked as triaged on February 6, 2024, and signed by a provider on February 8, 2024, but the date the sick call was submitted is illegible. *Id.* at 27.

On May 4, 2023, Ferandes again saw Dr. Bhatnagar at Precision Orthopedics and Sports Medicine for a follow-up regarding his left hand second digit chronic dislocation. ECF 35-5, at 24–25. Dr. Bhatnagar found the condition unchanged, noted that Ferandes was still experiencing pain, and referred him to Dr. Person for an evaluation. *Id.*

On May 16, 2023, Ferandes saw Dr. Djahanmir for a follow-up after his orthopedic consultation. ECF 35-4, at 24–26. Dr. Djahanmir recommended Ferandes continue with activity modification and noted he had been referred to Dr. Person by Dr. Bhatnagar for further consultation. *Id.* at 25. Dr. Djahanmir stated he would generate a consult for that purpose. *Id.*

Ferandes saw Guy Anthony Mazzone, PA-C, at Meritus Robinwood Orthopedics on July 11, 2023, who diagnosed a chronically dislocated MCP joint of the index finger with tear of the radial collateral ligament and possible avulsion fracture. ECF 35-5, at 20–23. Mazzone discussed the surgical recommendation including the risks and benefits of surgery, including the possibility of pinning, and explained that Gary M. Sherman, MD, would be performing the surgery. *Id.* at 22.

---

[6] There is no explanation for the gap in dates from April 9, 2023, to February 6, 2024. However, as noted below, it is likely a scrivener's error on Ferandes' part as Ferandes offers no opposition to RN Ehigiator's assertion that she was not employed in Maryland until July of 2023. *See* ECF 50-3, at 1.

On August 15, 2023, Ferandes saw NP Clark for a pre-operative history and physical. ECF 35-4, at 20–23. On August 17, 2023, Ferandes had surgery to repair the dislocation of the metacarpophalangeal joint of the left index finger performed by Dr. Sherman at the Meritus Medical Center. ECF 35-5, at 16–19. Ferandes was admitted to the infirmary on August 17–18, 2023, for observation following the surgery. ECF 35-4, at 9–19. On August 30, 2023, Ferandes saw Dr. Sherman at Meritus Robinwood Orthopedics for a surgical follow-up. *Id.* at 10–12. Pin sites were noted as clean, the incision was clean and dry, and sutures were removed. *Id.* at 11. A cast was placed for protection, and Ferandes was advised to keep it clean and dry. *Id.* Ferandes would require a new x-ray and a follow-up in four weeks for removal of the pins and cast. *Id.*

On October 3, 2023, Ferandes was admitted to the infirmary after having his hard cast and pins removed by the orthopedic surgeon. ECF 35-4, at 4. NP Clark observed mild to moderate post-operative swelling, and he was unable to flex his finger. *Id.* Ferandes was referred for a follow-up with Clark in two weeks as well as a physical therapy evaluation. *Id.* at 5.

Ferandes underwent an x-ray of his left hand on October 10, 2023, which showed no evidence of an acute fracture or dislocation, but showed the "K wires" (Kirschner wires) present spanning the index finger. ECF 35-5, at 8. The recommendation was for follow-up evaluation in 10–14 days if pain persisted, and an MRI or "three phase bone scan" to exclude an occult fracture. *Id.* On October 11, 2023, Ferandes saw PA-C Mazzone of Meritus Robinwood Orthopedics for a post-operative visit. *Id.* at 5–7. Mazzone removed the Kirschner wire, advised Ferandes to work on range of motion, and prescribed occupational therapy. *Id.* at 7. Ferandes was to return for evaluation in two months. *Id.*

Ferandes submitted sick call requests dated October 10 and October 23, 2022, stating that it has been over two weeks since he came back from surgery and asking why he had not been taken

8

to physical therapy. *Id.* at 28–29. The slips are marked as triaged on October 25 and 26, 2023, and signed by a provider on October 30, 2023,[7] with a note reflecting "PT eval 10/26." *Id.*

On October 26, 2023, Ferandes was evaluated by physical therapist Stephen D. Ryan, who prescribed eight sessions of physical therapy with the goal of restoring functional range of motion and strength as well as functional grip strength. ECF 35-4, at 2. Ferandes underwent PT on December 13, 2023. ECF 35-3, at 35; ECF 35-4 at 1.

On February 8, 2024, Ferandes saw RN Talley (formerly Martel)[8] for a nurse sick call complaining of significant pain in the left finger following surgery. ECF 35-3, at 33–34. Talley indicated that she would refer Ferandes to a provider the following week. *Id.* at 34. On April 6, 2024, Ferandes saw NP Clark for a follow-up regarding his finger injury. ECF 35-3, at 30–32. Clark noted moderate swelling and stiffness of the joints with inability to flex the finger and decreased grip strength. *Id.* at 30. She advised continued home exercises, warm compress for swelling and stiffness, and ibuprofen, and noted that additional PT was pending Utilization Management ("UM") approval. *Id.* at 31. Ferandes underwent physical therapy on April 11, 15, 17, 22 and June 3 and 5, 2024, but continued to experience pain. ECF 35-3, at 17–29. On June 6, 2024, Ferandes saw physical therapist Ryan for recertification of his physical therapy. ECF 35-3, at 13. Ryan noted that Ferandes reported pain notwithstanding having completed the current course of physical therapy. *Id.* On examination, Ryan noted mild edema, but the finger was functionally asymptomatic. *Id.* Ferandes filed suit on July 10, 2024. ECF 1.

---

[7] There is no explanation for the discrepancy in the date. However, since Ferandes had surgery in 2023, not 2022, it is likely that he incorrectly recorded the date on this sick call request since it explicitly references his surgery.

[8] Elizabeth Talley was formerly known as Elizabeth Martel, the name on the February 8, 2024 medical records. *See* ECF 35-1, at 13 n.1.

## II.   STANDARD OF REVIEW

RN Shank as well as the State Defendants filed motions to dismiss the amended complaint under Rule 12(b)(6). See ECF 33 (Shank); ECF 48 (State Defendants). The Court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and the parties' briefs. *See* Fed. R. Civ. P. 12(b)(6), 12(d); *see also* Fed. R. Civ. P. 10(c); *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (citation omitted). In contrast, Rule 12(d) requires courts to treat such a motion as a motion for summary judgment if matters outside the pleadings are considered and not excluded. *See* Fed. R. Civ. P. 12(d).

In reviewing a Rule 12(b)(6) motion to dismiss, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). Further, a federal court must liberally construe pleadings filed by pro se litigants to allow them to fully develop potentially meritorious cases. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

The remaining defendants have moved alternatively for summary judgment.[9] Summary judgment is governed by Fed. R. Civ. P. 56(a) which provides "[t]he court shall grant summary

---

[9] These defendants move for dismissal or for summary judgment. ECFs 35 and 37. A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011), *aff'd* 684 F.3d 462 (4th Cir. 2012). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where a plaintiff has notice that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). When a movant expressly captions its motion to dismiss "in the alternative" as one for summary judgment and submits matters outside the pleadings for the Court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur because the Court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261; *see also Willey v. Bd. of Educ. of St. Mary's Cnty.*, 557 F. Supp. 3d 645, 657 (D. Md. 2021) ("Notably, 'the Federal Rules do not prescribe that any particular notice be given before a Rule 12 motion is converted to a Rule 56 motion.'" (quoting *Ridgell v.*

10

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The Court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The Court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted)

---

*Astrue*, Civ. No. DKC 10-3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012)). At the same time, the Fourth Circuit has warned against granting summary judgment before discovery where "the district court [is] aware of a potential need for discovery" and a pro se plaintiff's request for discovery (regardless of the form of that request). *Farabee v. Gardella*, 131 F.4th 185, 196 (4th Cir. 2025).

Ferandes has been on notice that certain of the defendants seek summary judgment since the filing of the motions on July 9, 2025 (ECF 35) and July 14, 2025 (ECF 37), and after receiving the Court's Rule 12/56 Notices mailed on July 10, 2025 (ECF 36) and July 15, 2025 (ECF 38). *See* Fed. R. Civ. P. 12(d) (noting that if a court is going to treat a motion to dismiss as one for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion"). As such, where appropriate, the dispositive submission filed by the remaining defendants will be treated as a motion for summary judgment under Fed. R. Civ. P. 56 because materials outside the original pleadings have been considered.

11

(quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## III.   ANALYSIS

Ferandes brings this action under the Eighth Amendment for Defendants' failure to treat his medical condition, which requires evidence of both a serious medical need and deliberate indifference to that need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834–37 (1994); *see also Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839–40. Under this standard, "the prison official must

12

have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (emphasis added) (quoting *Bowring v. Godwin*, 551 F.2d 44, 47–48 (4th Cir. 1977)). "[A]n inadvertent failure to provide adequate medical care" does not amount to deliberate indifference. *Estelle*, 429 U.S. at 105–06; *accord Anderson*, 877 F.3d at 543 ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)); *accord Jackson*, 775 F.3d at 178 ("[W]e consistently have found such

13

disagreements to fall short of showing deliberate indifference."). However, it is established that delay of treatment in the face of significant pain is the kind of harm sufficient to support a finding of deliberate indifference. *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 733–34 (Mem) (4th Cir. 2015); *see Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (collecting cases).

### A.    RN Sandra Shank's Motion

Defendant RN Sandra Shank moves to dismiss the amended complaint for failure to state a claim, arguing that she is only mentioned once in that filing and that no allegations of deliberate indifference to a serious medical need are attributed to her. ECF 33. In fact, the only allegation in the amended complaint against RN Shank is that Ferandes "filed request 10-23-23 R.N. S. Shan[k] received." ECF 16, at 7. Ferandes opposes Shank's motion, arguing that "Defendant Shank neglected to follow her duty and forward my sick-call request which exacerbated my delay in care." ECF 39, at 2. However, the amended complaint only alleges that the sick call slip was received by Shank—Ferandes does not allege that she failed to forward it to anyone. Furthermore, even if Shank did fail to forward a single sick call slip, this error, standing alone, would not rise to the level of a constitutional violation since deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *see also Watson v. Smith*, No. 5:18-CV-142-FDW, 2019 WL 1460263, at *11 (W.D.N.C. Apr. 2, 2019) (finding "two brief contacts with Plaintiff's care fail[ed] to adequately allege that [defendant nurse] knew of, and

14

deliberately disregarded, any serious medical need of Plaintiff's"); *Wallace v. McDowell Cnty. Comm'n*, No. CIV.A. 1:14-17900, 2014 WL 6818017, at *7 (S.D. W. Va. Nov. 5, 2014) ("Plaintiff's mere allegation that [nurse defendant] incorrectly responded to his grievance concerning his pain medication is insufficient to state a claim under the Eighth Amendment."), *report and recommendation adopted*, No. CIV.A. 1:14-17900, 2014 WL 6818208 (S.D.W. Va. Dec. 2, 2014); *cf. Aurel v. Hallworth*, Civ. No. ELH-19-0185, 2020 WL 5423184, at *19 (D. Md. Sept. 10, 2020) (finding that plaintiff's "generalized allegations that [medical provider] defendants destroyed or ignored his sick call slips d[id] not alter the Court's" conclusion that the evidence of "extensive documentation of the medical care received" did not establish deliberate indifference). As such, RN Shank's motion to dismiss will be granted.

### B. RN Queen Ehigiator's Motion

Ferandes alleges that he filed a sick call request on February 1, 2023, but that Defendant RN Ehigiator did not receive or forward his request until a year later, on February 6, 2024. ECF 16, at 5–6. He alleges that RN Ehigiator "neglected her duty to triage and forward request so she played a part in my 'denial of care' taking (1) one year to even acknowledge request [sic]." *Id.* at 6. He further alleges that Ehigiator failed to triage a second request he filed on April 1, 2023, until February 6, 2024. *Id.*

Ferandes' claims against Ehigiator fail. The Court begins by noting that the sick call slips referenced were likely misdated as completed in 2023 rather than 2024 given that RN Ehigiator attests under oath that she did not move to Maryland or start working here until July of 2023 and thus could not have received the slips in February of April of 2023. ECF 50-3, at 1. Ferandes does not challenge this assertion. Regardless, even if Ehigiator had neglected a duty to timely forward two sick call slips, for the same reasons described above in reference to the allegations against RN

Shank, this alone does not constitute deliberate indifference to a serious medical need under the circumstances here where the record reflects that Ferandes received medical care during the relevant time frame despite the alleged failure to forward the slips. *See Lightsey*, 775 F.3d at 178; *Estelle*, 429 U.S. at 106; *Watson*, 2019 WL 1460263, at *11; *Wallace*, 2014 WL 6818017, at *7; *Aurel*, 2020 WL 5423184, at *19 (D. Md. Sept. 10, 2020). RN Ehigiator's motion, construed as one for summary judgment,[10] will be granted.

### C.    YesCare's and Centurion's Motions

Defendants YesCare, NP Clark, RN Fazenbaker, and RN Talley (collectively, "YesCare Defendants") filed a motion to dismiss, or in the alternative, for summary judgment arguing that the amended complaint fails to state a claim and that there are no genuine issues of material fact in dispute. ECF 35. In support, YesCare Defendants submit a memorandum of law, the declaration of NP Clark, Ferandes' medical records, the declaration of RN Fazenbaker, and the declaration of RN Talley. *See* ECF 35-1 through ECF 35-9. This motion is fully ripe. *See* ECF 44 (Ferandes' opposition); ECF 45 (YesCare Defendants' reply). Defendants Clark and Fazenbaker as well as Centurion and RN Buser also filed a motion to dismiss, or in the alternative, for summary judgment, arguing that Ferandes fails to state a claim, failed to satisfy conditions precedent to filing a State medical malpractice claim, Defendants did not violate Ferandes' Eighth Amendment rights, and Defendants are entitled to qualified immunity. *See* ECFs 37 and 37-1. They also incorporate by reference the arguments made in YesCare's motion. ECF 37-1, at 6 n.4, at 9 n.8. Ferandes did

---

[10] This motion is properly treated as a motion for summary judgment as Ferandes does not dispute RN Ehigiator's evidence of when she began working in Maryland (or argue that discovery would lead to contradictory evidence) and such evidence is dispositive of the claim. *Cf. Farabee*, 131 F.4th at 196.

not separately oppose Centurion's motion, however, the arguments he presents in opposition to YesCare's motion are largely applicable and will be considered.

### 1. NP Janette Clark

In her declaration, NP Clark acknowledges that there were delays in Ferandes' follow-up care after she saw him for the injury to his finger on June 10, 2022. ECF 35-2, at 2. However, she states that such delays were "entirely out of [her] control," because she has "no role in scheduling and [] can only see patients when they are placed on [her] schedule." *Id.* She declares that she "ordered both a follow-up for nursing to remove [Ferandes'] stitches and a follow-up with a provider after the x-ray to review the results, but it appears that neither was scheduled." *Id.* at 2–3. She further declares that she does not have the capacity to follow up on each individual inmate's medical care, "because there are over 1,500 inmates at WCI," and that the records show that when she saw Ferandes, she "was very thorough in [her] treatment, ordered appropriate medications, and submitted consultation requests." *Id.* at 3. Clark notes that after the initial delays, Ferandes' treatment moved quickly, and that by June of 2024, he was discharged from physical therapy with a functionally improved and asymptomatic finger. *Id.* Regarding Ferandes' allegation that some of his sick calls were not answered for a year, Clark states that Ferandes wrote the incorrect date on the sick call slips, but that regardless, she does not have any role in the collecting, triaging, or answering of sick call requests. *Id.*

Referencing the medical records, NP Clark declares that she saw Ferandes on June 10, 2022, for an urgent visit after an altercation, where she obtained vital signs and sent him for a decontamination shower. ECF 35-2, at 4. Next, she cleaned and sutured the cut to Ferandes' left eyebrow. *Id.* She examined the left index finger, finding that it had full range of motion, but that Ferandes was "holding it flexed at the middle joint." *Id.* She "buddy-taped" the finger, which she

17

declares "is the appropriate treatment." *Id.* Because there was no x-ray service available that day, NP Clark referred Ferandes for the next available x-ray appointment, which typically occurs 2–3 times per week. *Id.* She also ordered nursing to remove the sutures in 7–10 days, and a follow-up with a provider to review the x-ray in two weeks. *Id.* NP Clark avers that "[i]n 2022, this would be tasked through our electronic health record ('EPSR') to the onsite scheduler," and that "[a]s an added level, [she] always printed [her] note, highlighted the follow up and put it on the on-site scheduler's desk." *Id.* NP Clark states that neither the nursing follow-up nor the provider follow-up she ordered were scheduled. *Id.* at 4–5. Clark notes that on June 29, 2022, Ferandes saw RN Taferi complaining of his swollen finger, where Ferandes told Taferi that he was waiting for results of x-rays. *Id.* at 5. RN Taferi gave Ferandes ibuprofen and advised him to exercise the finger to avoid stiffness. *Id.* RN Taferi's notes indicate that she would refer him to a provider, but no provider visit was scheduled. *Id.*

NP Clark reviewed Ferandes' sick call requests, noting that the requests dated October 23 and 24, 2022, appear to be misdated, because they reference his recent surgery which occurred in 2023. ECF 35-2, at 6. She observes that the first sick call request made after his June 29, 2022 visit with RN Taferi was made on December 21, 2022. *Id.* There is no record that Ferandes submitted any sick call requests between June and December of 2022. *Id.*

NP Clark declares that after Ferandes' January 4, 2023 appointment with RN Buser, Buser noted that she had spoken with a provider and would get Ferandes an appointment the following day. ECF 35-2, at 7. However, NP Clark did not recall any such conversation herself and is unsure if she was working that day. *Id.* NP Clark opines that RN Buser wrote "see Ms. Clark" on the record because Clark had initially seen Ferandes about the finger. *Id.* However, NP Clark attests

18

that Ferandes was not placed on her schedule nor was there a provider follow-up scheduled for the next day. *Id.*

NP Clark next saw Ferandes for pre-operative history and physical on August 15, 2023, and she cleared him for surgery. ECF 35-2, at 12–13. Clark saw Ferandes in the infirmary on August 18, 2023, following surgery. *Id.* at 13. She advised him "not to remove the post-op dressing or get it wet and to apply ice to the area as needed for comfort and to elevate the arm." *Id.* She also prescribed Tylenol and submitted a consultation request for a post-up visit which was approved. *Id.* On October 4, 2023, NP Clark submitted a consultation request for a physical therapy evaluation. *Id.* NP Clark next saw Ferandes after he returned to the infirmary following a follow-up with orthopedics at which his hard case and pins were removed. *Id* at 15. A physical therapy consultation request had already been approved, and NP Clark extended the Tylenol and ibuprofen prescriptions. *Id.* Following his physical therapy evaluation, NP Clark submitted a consultation request for eight sessions of physical therapy as recommended by Physical Therapist Stephen Ryan. *Id.* The request was denied in favor of a home exercise plan, and NP Clark appealed, noting that Ferandes saw Ryan for an evaluation, not a home exercise plan education. *Id.* at 16. Ferandes was then approved for one additional session of PT. *Id.*

NP Clark notes that Ferandes saw RN Talley (formerly Martel) on February 8, 2024, for pain in his finger as well as difficulty bending and utilizing it. *Id.* She took his vital signs and examined the hand, encouraged heat and ice compresses and advised him to purchase ibuprofen from commissary as well as to place a sick call if symptoms worsen. *Id.* RN Talley referred Ferandes for a provider visit the following week, but the visit was not scheduled. *Id.*

NP Clark saw Ferandes again on April 6, 2024, for a follow-up, and she observed "moderate swelling and stiffness of the MCP and PIP joints, inability to flex the finger, and

19

decreased grip strength." ECF 35-2, at 17. NP Clark advised Ferandes to continue home exercises and use warm compresses. *Id.* She also extended his prescription for ibuprofen and submitted a consultation request for six sessions of PT, which were approved and completed. *Id.*

For his part, Ferandes contends that NP Clark's admission of delays as well as her failure to follow up on the removal of his stitches and x-ray are evidence of her deliberate indifference to his serious medical needs. ECF 44, at 3–4. However, the undisputed evidence reflects that NP Clark is not responsible for scheduling and has no way of knowing whether x-ray reports were returned or follow-up care was scheduled as she is unable to personally follow-up on each individual patients' care in addition to her scheduled appointments. She placed the proper referrals in the electronic record and put a hard copy on the scheduler's desk. NP Clark provided evidence that she does not have control over scheduling and that she cannot and is not expected to keep track of her scheduling requests for each patient she sees. Because she was not personally involved in scheduling follow-up appointments, she cannot be liable for an Eighth Amendment violation premised on that denial of care. *See Moone v. Herrick,* No. 7:21CV00472, 2022 WL 4594027, at *12 n.13 (W.D. Va. Sept. 29, 2022) (finding no Eighth Amendment violation against a doctor "because [plaintiff] has presented nothing to dispute [the doctor's] testimony that he was not responsible for reviewing complaints or for making appointments for patients"), *aff'd,* No. 22-7244, 2023 WL 3144549 (4th Cir. Apr. 28, 2023); *Edwards v. White,* No. 9:19-CV-03114-JD-MHC, 2021 WL 3080964, at *8 (D.S.C. June 11, 2021) (noting that, where medical professional defendant attested to delays in mental heath appointments being the result of scheduling errors, "even if this alleged denial of mental health services rose to the level of a constitutional violation— which it does not—Plaintiff has nevertheless failed to show [medical professional defendant's] personal involvement in the alleged violation" as plaintiff did not dispute testimony that defendant

20

was not responsible for scheduling appointments), *report and recommendation adopted,* No. 9:19-CV-03114-JD-MHC, 2021 WL 3080158 (D.S.C. July 21, 2021).

The evidence shows that Clark treated Ferandes' injury by buddy-taping the fingers, prescribing ibuprofen, ordering an x-ray, submitting consultation requests for specialist visits and physical therapy. While Ferandes alleges that NP Clark "did not want to [] care for [his] finger due to the fact that she had stitched [his] eye," ECF 1, at 2, the unrefuted evidence is clear that she provided appropriate treatment at the time. Other than the delay in follow-up care, which was undisputably not NP Clark's responsibility, Ferandes does not state what treatment he believes he should have been provided by NP Clark but was refused, and he does not suggest that further evidence may dispute NP Clark's evidence about her lack of control over scheduling. To the extent that Ferandes believes NP Clark should have provided a different or additional treatment, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright,* 766 F.2d at 849 (citing *Gittlemacker,* 428 F.2d at 6); *accord Jackson,* 775 F.3d at 178 ("[W]e consistently have found such disagreements to fall short of showing deliberate indifference."). Viewed in the light most favorable to Ferandes, the evidence shows that NP Clark provided Ferandes with appropriate treatment when she saw him and that she was not deliberately indifferent to his medical needs. As such, NP Clark's motion, construed as one for summary judgment,[11] shall be granted.

---

[11] Because Ferandes does not contend that discovery would dispute NP Clark's evidence of lack of personal involvement in scheduling follow-up appointments, a fact central to Plaintiff's claim against her, summary judgment appropriately decided at this juncture. *Cf. Farabee,* 131 F.4th at 196.

### 2. RN Kimberly Fazenbaker

Ferandes alleges RN Fazenbaker "did not even take vitals" when he saw her. ECF 16, at 7. In response, Fazenbaker declares that she responded to sick calls filed on October 23 and 24, 2023, inquiring about when his physical therapy would be scheduled. ECF 35-8, at 2. She notes that the sick call requests were incorrectly dated 2022 rather than 2023. *Id.* Fazenbaker avers that she responded to the sick call slips on October 30, 2023, by informing Ferandes that he had the physical therapy evaluation on October 26, 2023. *Id.* Because the sick call slips were requests for information about PT scheduling, Fazenbaker found no need to take Ferandes' vitals or see him. *Id.* In response, Ferandes appears to mix up the sick call requests, referencing not the October 2023 request but his December 21, 2022 request. ECF 44, at 7 (referencing "Exhibit 5," ECF 44-4, which is the December 21, 2022 sick call request complaining that his finger was still injured and claiming that he had not been seen since the x-ray). Ferandes presents no evidence to refute Fazenbaker's response that there was no reason to take his vitals in response to his October 2023 sick call requests regarding physical therapy. As such, there is no dispute of material fact that RN Fazenbaker properly responded to Ferandes' sick call request, and summary judgment will be granted in her favor.

### 3. RN Elizabeth Talley

Ferandes alleges that on February 8, 2024, RN Talley denied him care, failed to examine him or take his vitals, and simply informed him that he would see a provider. ECF 16, at 6. He alleges that this visit was, in part, in response to a sick call request he had placed nearly a year earlier on April 1, 2023. *Id.* RN Talley declares that Ferandes' allegations regarding the months-long delay in triaging sick call requests is false, noting that Ferandes has written incorrect dates on multiple sick call requests. ECF 35-9, at 2. Talley further declares that she saw Ferandes on

22

February 8, 2024, in response to two sick call requests complaining of continued pain after surgery. *Id.* at 3. She states that she took his vitals and performed "a thorough nursing examination," which is reflected in the medical records. *Id.*; *see also* ECF 35-3 at 33–34. Talley referred Ferandes to a provider for an evaluation and advised the use of ibuprofen and heat and ice compresses. *Id.* at 4.

Talley further attests that when referring a patient to a provider, she would either "write the referral on the pass list paper that is turned into the scheduler or send the referral by email." *Id.* She notes that even though she requested a provider appointment for the following week, Ferandes was not seen until nearly two months later, on April 6, 2024. *Id.* However, she avers that the delay was out of her control. *Id.*

The evidence shows that contrary to Ferandes' allegations, on February 8, 2024, Talley conducted a thorough examination and referred him to a provider for the following week. While the provider follow-up was not scheduled until two months later, Ferandes does not challenge Talley's assertion that she had no control over, or personal involvement in, the scheduling delay. Because the evidence is clear that Talley was not deliberately indifferent to Ferandes' finger pain, she is entitled to summary judgment, and her motion will be granted.

### 4. RN Tammy Buser

RN Buser is only mentioned once in the amended complaint, when Ferandes alleges that he saw her on January 4, 2023, but claims that she provided no treatment. ECF 16, at 5. This brief statement is not sufficient to state a claim against her. Even if the allegation was liberally construed to state a claim of inadequate medical care, the uncontroverted medical records make clear that RN Buser was not deliberately indifferent to Ferandes' serious medical condition. During the visit in question, she took his vitals and examined his hand, noting that the right pointer finger was dislocated and had very limited function. ECF 35-4, at 34. She stated that she "will attempt to get

23

him scheduled asap with a provider." *Id.* She additionally stated that she "spoke with provider and scheduler" and "[w]ill schedule an appointment for tomorrow." *Id.* at 33. The records are clear that RN Buser did provide care during the January 4, 2023 visit. Ferandes' contention that she "should have taken vitals according to [his] request," ECF 44, at 8, amounts to nothing more than a disagreement about the medical care he believed was warranted. Nor has Ferandes explained how a single instance of failure to take his vitals has harmed him. That is not enough to establish deliberate indifference. *See Wright*, 766 F.2d at 849; *Dickerson v. Schmitt*, No. 7:23-CV-00068, 2023 WL 3726507, at *7 (W.D. Va. May 30, 2023) ("Even if someone in the medical department was negligent for not ensuring that [plaintiff's] blood pressure was checked on some of the days he was to be monitored, that action does not amount to deliberate indifference."); *Lancaster v. Akers*, No. 7:15CV00402, 2016 WL 590480, at *2 (W.D. Va. Feb. 11, 2016) ("[Plaintiff] does not allege any harm he suffered because the nurse did not take his vital signs, and as such, he states no Eighth Amendment claim here."). RN Buser's motion, construed as one for summary judgment, will be granted.

### 5. YesCare and Centurion's Motions

Ferandes alleges that YesCare and Centurion had a custom or policy of denying care to detainees that rises to the level of deliberate indifference. In support, he alleges that from June 10, 2022, forward, he "constantly kept filing sick-call encounter request[s] only to be called out to be evaluated by nurses with a promise to put appointment into be seen by provider. So for 7 ½ to 8 months [he] kept seeing nurses who all kept saying they'd put [him] in to see the doctor with no results." ECF 16, at 4–5. Ferandes alleges that he filed sick-call slips to remove the stitches from his eye and for continuous hand pain "to no avail." *Id.* at 5.

24

In the case of *Monell v. Dep't of Soc. Servs. of City of New York*, the Supreme Court held that local governmental entities may be liable under § 1983 based on the unconstitutional actions of individual defendants where those individual defendants were executing an official policy or custom of the local government that violated the plaintiff's rights. 436 U.S. 658, 690–91 (1978). The *Monell* Court explained that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *Id.* at 694; *see also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Relevant here, *Monell* liability has been extended to private entities operating under color of state law, including private prison health care providers. *See, e.g., West v. Atkins*, 487 U.S. 42, 49 (1988); *Polk Cnty. v. Dodson*, 454 U.S. 312, 320 (1981); *Rodriguez v. Smithfield Packing Co.*, 338 F.3d 348, 355 (4th Cir. 2003); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999). Thus, the standards applicable to municipalities apply with full force to YesCare and Centurion. *See Rodriguez*, 338 F.3d at 355 (observing that principles of § 1983 municipal liability "apply equally to a private corporation" acting under color of state law) (citation omitted).

A viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See, e.g., Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

YesCare was medical contractor at the time of Ferandes' injury in June of 2022 until Centurion took over as the medical contractor on August 1, 2024. Ferandes alleges that he placed numerous sick calls following his June 2022 injury and x-ray. He was only seen by nurses who

25

then referred him to a provider that he was unable to see for many months, until January of 2023. The medical records do not include copies of any of these sick call requests or nurse visits. Even if Ferandes did not complain about the lack of follow-up care until December 2022, as the records appear to show, the evidence reflects that there was a significant delay in follow-up care for an injury that required surgical repair. Records also reflect repeated scheduling failures over the course of two years. Additionally, Ferandes presents a short affidavit wherein Ferandes and two other inmates attest that "medical employees constantly on a daily basis deny [and] delay care." ECF 44-1. In acknowledging the delays, YesCare asserts that "it appears this was due to negligence or inadvertence by the scheduler, which," YesCare contends, "is not attributable to YesCare under a *respondeat superior* theory of liability." ECF 35-1, at 28 (citing *Monell*, 436 U.S. at 691; *Love-Lane*, 355 F.3d at 782). But YesCare has presented no evidence to support its contention that the scheduler was personally responsible for these delays. Moreover, YesCare fails to refute Ferandes' claim that customs or policies, or the lack thereof, as implemented by the schedulers, were responsible for the delays.[12] NP Clark and RN Talley both acknowledge significant delays in care and repeated referrals to providers that were either not scheduled at all or scheduled far beyond the time-period directed by the referral. Both explained how they communicated their referrals to a scheduler, which the record reflects were inconsistent. NP Clark stated that while she placed referrals electronically, she also placed a hard copy on the scheduler's desk. RN Talley stated that

---

[12] In its reply to Ferandes' opposition, YesCare contends that Ferandes' argument that "YesCare has a custom or policy of having an inadequate sick call process" is raised for the first time, and therefore should not proceed. ECF 45, at 6. But a liberal construction of the amended complaint, as is owed to a *pro se* prisoner litigant such as Ferandes, reflects that he did raise this claim. *See* ECF 16, at 15. Under the heading "Custom or Policy of Denying Care or Giving Inadequate Care," Ferandes outlines the delays he experienced in obtaining care due to provider visits and follow-up care not being scheduled. ECF 16, at 5–6. While he may have more succinctly stated his position in his opposition, the Court finds that his claim was sufficiently stated in his amended complaint.

26

she used one of two different methods of communicating her referrals to the scheduler. Viewed in the light most favorable to Ferandes, and considering both the repeated failures to schedule care he needed together with the apparent lack of a consistent and reliable scheduling system, it remains factually unsettled whether YesCare engaged in a policy or custom of failing to ensure patients, like Ferandes, received necessary care or were met with deliberate indifference to their serious medical conditions. As such, YesCare's motion for summary judgment will be denied.

Ferandes' claim against Centurion, however, fails. Centurion's medical care service contract started on August 1, 2024. ECF 37-1, at 7 n.5. The events described in the amended complaint occurred between June 10, 2022, and February 8, 2024, prior to Centurion's taking over the contract from YesCare. ECF 16. As such, Centurion could not have contributed to the alleged inadequate medical care. As such, Centurion's motion, construed as a motion for summary judgment, will be granted.

### D.    State Defendants' Motion

Warden Weber, Assistant Warden Butler, and the Maryland Division of Correction move to dismiss the amended complaint because it fails to state a claim upon which relief can be granted. ECF 48. Defendants argue that they are immune from suit in their official capacities, the Division of Correction is not a person amenable to suit under § 1983, the amended complaint fails to allege Weber and Butler's personal involvement or state a constitutional claim, and they are entitled to qualified immunity. ECF 48-1, at 4–11. Ferandes filed an opposition, ECF 53, and the State Defendants filed a reply, ECF 54.

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution, and must also show "that the alleged deprivation was committed by a *person* acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (emphasis added).

27

In *Will v. Michigan Department of State Police*, the Supreme Court explained that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." 491 U.S. 58, 71 (1989). When damages would be payable from the state treasury, the state is the real party of interest even though officials are the nominal parties. *Id.* (finding no difference in a suit against a state officer in his official capacity and a suit against the state itself.).

Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from suits in federal court brought by its citizens or the citizens of another state, unless it consents. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Id.* (citing *Florida Department of Health v. Florida Nursing Home Assn.*, 450 U.S. 147 (1981) (*per curiam*)). Moreover, "a State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Halderman*, 465 U.S. at 100 (emphasis in original). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-201(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court.

Weber and Butler are immune from suit for damages in their official capacities under the Eleventh Amendment. The Division of Correction, a state agency, is likewise immune from suit. As such, the amended complaint will be dismissed as to the Division of Correction and as to Weber and Butler in their official capacities.

Weber and Butler additionally argue that Ferandes has not stated a claim against them, because he has not alleged their personal participation in the alleged failure to provide care to Ferandes. In response, Ferandes argues that their receipt of, and response to, his grievances put

28

them on notice that he was not receiving adequate medical care and they still refused to act. However, without subjective knowledge, a prison official is not liable for violating the Eighth Amendment. *Farmer,* 511 U.S. at 846; *see also Johnson v. Quinones,* 145 F.3d 164, 168 (4th Cir. 1998). Weber and Butler's limited roles do not establish personal liability for unconstitutionally inadequate medical care. Neither investigated Ferandes' substantive complaints regarding his medical care or was otherwise involved with providing his medical care. *See Chukwurah v. Corizon Health Care,* Civ. No. PX-22-212, 2023 WL 4268556, at *6 (D. Md. June 29, 2023) (noting that mere dismissal of inmate's grievance "does not extend liability for constitutionally inadequate care" (citing *Gallagher v. Shelton,* 587 F.3d 1063, 1069 (10th Cir. 2009); *Whitington v. Ortiz,* 307 F. App'x 179, 193 (10th Cir. 2009))), *aff'd,* No. 23-6716, 2024 WL 1405885 (4th Cir. Apr. 2, 2024).

Even if Weber and Butler's subjective knowledge of Ferandes' serious medical needs could be established by way of receipt of and responses to grievances, Ferandes did not make such a claim in his amended complaint. As such, their motion to dismiss will be granted.

### E.    Unserved Defendants

Ferandes names several defendants for whom service was not accepted and remain unserved, including RN Taferi, Radiologist Dr. Syed, and RN Budu. *See* ECF 16; ECF 21; ECF 23. Ferandes fails to state a claim against any of these defendants. Therefore, they will be dismissed.

Ferandes alleges that RN Taferi "said to exercise finger not knowing I needed surgery." ECF 16, at 4. This statement is inapposite to a claim of deliberate indifference to a serious medical need, in that the claim itself alleges that RN Taferi was unaware of the severity of the injury.

29

Because a constitutional claim for inadequate medical care requires knowledge of a serious medical condition, Ferandes' claim against Taferi fails.

As to defendant RN Budu, Ferandes alleges that he "filed request 12-21-22 R.N. [B]udu received request 12/22/22" and that he "was called out to be seen by RN Tammy Buser who did not see me until 1-4-23." There is no allegation that Budu was deliberately indifferent to Ferandes' serious medical condition. He simply alleges that Budu received the request on December 22, 2022, and that he was not seen until January 4, 2023. To the extent that Ferandes implies that Khudu was somehow responsible for this short delay, this allegation standing alone is not sufficient to constitute a constitutional claim of inadequate medical care.

Finally, Ferandes alleges that "Radiologist Labib H. Syed, MD failed to forward x-ray to Med. Dept. to be read & shared with me. The result was that I had to get a second x-ray because the original was lost or it was misplaced on June 14, 2022 I'm guessing." ECF 16 at 3. This allegation, which infers both that Dr. Syed failed to forward the x-ray and that the x-ray was lost, is insufficient to state an Eighth Amendment claim. *See Sorrick v. Manning*, Civ. No. TDC-16-0709, 2017 WL 3668755, at *9 (D. Md. Aug. 22, 2017) ("The alleged misplacement of x-rays, delays in scheduling appointments and orthopedic consultations, and delay in diagnosing Sorrick's injury as a rotator cuff injury requiring surgery likewise do not support a claim of an Eighth Amendment violation. . . . At most, the delays and other deficiencies described in the Amended Complaint amount to negligence".), *aff'd,* 717 F. App'x 300 (4th Cir. 2018).

## IV.    CONCLUSION

For the reasons stated herein, Defendant RN Sandra Shank's motion to dismiss is granted. Defendants NP Janette Clark, RN Kimberly Fazenbaker, RN Elizabeth Talley, and RN Tammy Buser's motions, construed as motions for summary judgment, are granted. Defendant YesCare's

motion, construed as a motion for summary judgment, is denied. Defendant Centurion's motion, construed as a motion for summary judgment, is granted. Defendant RN Queen Ehigiator's motion, construed as a motion for summary judgment, is granted. The State Defendants' motion, construed as a motion to dismiss, is granted. The amended complaint is dismissed as to the remaining unserved defendants for failure to state a claim.

. A separate Order follows.

Dated: <u>March 24, 2026</u>

<u>                    /s/                    </u>
Brendan A. Hurson
United States District Judge